**MOORE–McCORMACK LINES, INC.,**

v.

**The UNITED STATES.**

Claim No. 572–57.

United States Court of Claims.

Decided April 4, 1962.

Rehearing Denied July 18, 1962.

J. A. Dickinson, Washington, D. C., for plaintiff. Paul C. Aiken, Washington, D. C., was on the briefs.

Thomas F. McGovern, Washington, D. C., with whom was Asst. Atty. Gen. William H. Orrick, Jr., for defendant.

WHITAKER, Judge.

This is a suit to recover compensation for the carriage of mails from ports on the east coast of South America to ports on the Atlantic coast of the United States. Plaintiff, a steamship company, whose vessels fly the flag of the United States, is the same corporation as was the plaintiff in Moore-McCormack Lines, Inc. v. United States, 119 Ct.Cl. 473, cert. denied, 342 U.S. 876, 72 S.Ct. 166, 96 L.Ed. 658. In that suit plaintiff sought to recover compensation for the carriage of outbound mails from ports of Argentina, Brazil, and Uruguay for years prior to 1942, at which time plaintiff's service was interrupted because of World War II.

In the earlier suit the entire claim as to the northbound mails from Argentina and part of the claim as to northbound mails from Uruguay were abandoned by plaintiff, pursuant to a stipulation between the parties, under which it was agreed that, since Argentina and, until 1940, Uruguay, required plaintiff to carry their mails without further charge, in

consideration of the granting by those countries of certain packet privileges to plaintiff, no payment was due from the United States for the carriage of Argentine mails and, for the period prior to 1940, of Uruguayan mails. In 1940 Uruguay had suspended its packet privilege law, thereby relieving the plaintiff from the obligation of carrying its mails without charge and, hence, for the period subsequent to 1940 the United States conceded liability, under the Postal Union Convention, to pay the charges.

The parties also agreed that, if a Brazilian decree of June 3, 1941, required plaintiff to carry Brazilian mails gratuitously, then the United States was not liable to compensate plaintiff therefor. We construed the Brazilian decree as requiring the gratuitous carriage of the mails; hence, we held, pursuant to the stipulation, the United States was not liable for the carriage of these mails during the period this decree was in effect.

In Count I of its petition in this action plaintiff seeks to recover from the United States compensation for the carriage of outbound mails from ports of Argentina, Brazil and Uruguay for years subsequent to World War II, beginning in 1946 when plaintiff's service was resumed, and ending on March 1, 1956, when the United States withdrew from the Postal Union.

In Count II plaintiff sues to recover expenses incurred in the cartage of incoming South American mails from its piers to post offices in the United States.

Count III is a claim for money plaintiff says it would have received for the carriage of mails had not the Post Office Department improperly diverted such mails to foreign vessels. Plaintiff says this was in violation of section 405(a) of the Merchant Marine Act of 1936, 49 Stat. 1985, 46 U.S.C.A. § 1145(a), which gave its vessels preference over those of foreign registry.

COUNT I

Except for the years 1942 through 1946, during which plaintiff's

vessels were operated by the United States, pursuant to requisition for use during World War II, plaintiff has been continuously engaged for many years in the carriage of mails between the ports of Rio de Janeiro, Brazil; Buenos Aires, Argentina; and Montevideo, Uruguay, and various ports on the Atlantic coast of the United States, particularly New York, on vessels flying the flag of the United States.

In accordance with 5 U.S.C.A. § 372, the Postmaster General of the United States negotiated and concluded with the governments of certain Central and South American countries, including that of Argentina, Brazil and Uruguay, several postal conventions, which, beginning with the Second Congress of the Pan American Postal Union held in Mexico in 1926, became known as the Postal Union of the Americas and Spain.

The Convention of the Postal Union of the Americas and Spain of December 22, 1936, ratified by the Postmaster General on August 12, 1937, and approved by the President on August 20, 1937 (50 Stat. 1657), provided in part:

"ARTICLE 3
"Free and gratuitous transit
"1. The gratuity of territorial, fluvial and maritime transit is absolute in the territory of the Postal Union of the Americas and Spain; consequently, the countries which form it obligate themselves to transport across their territories, and to convey by the ships of their registry or flag which they utilize for the transportation of their own correspondence, without any charge whatsoever to the contracting countries, all that which the latter [may] send to any destination.

"2. In cases of reforwarding, the contracting countries are bound to reforward the correspondence by the ways and means which they utilize for their own dispatches. * * *"

This provision was incorporated without change in the Postal Convention of Sep-

tember 25, 1946, ratified by the Postmaster General on February 20, 1947, and approved by the President on February 27, 1947 (61 Stat. 3505).

The Postal Convention of November 9, 1950, ratified by the Postmaster General on June 7, 1951, and approved by the President on June 22, 1951, provided in part:

## "ARTICLE 3

"Free and gratuitous transit

"1. The gratuity of territorial, fluvial and maritime transit is absolute in the territory of the Postal Union of the Americas and Spain; consequently the countries which form it obligate themselves to transport across their territories and to convey by ships of their registry or flag, without any charge to the contracting countries, all the correspondence which the latter may send to any destination whatsoever. However, this gratuity of transit will not be applied to the subsequent maritime transmissions of correspondence destined for a third country which is not a member of the Postal Union of the Americas and Spain in cases where a reshipment or transfer may be necessary, or justified expenses of handling may arise.

"2. Likewise, when services of foreign Administrations are required for the subsequent conveyance of the closed mails, collection can be made from the Administrations of origin of the same amounts which the intermediary Administrations may be compelled to pay therefor.

"3. In cases of onward dispatch, the contracting countries bind themselves to forward the correspondence by the most rapid ways and means which they utilize for their own mails. * * *"

The obligation of the United States to compensate plaintiff for the carriage of the mails in question, if any, arises under these postal conventions.

Plaintiff says that the United States, acting through the Postmaster General, by entering into the various postal conventions providing for "free and gratuitous transit" of convention mails on vessels of its flag and by the issuance of orders providing for payment for the carriage of such mails by vessels of its flag, impliedly agreed to compensate plaintiff for the carriage of the mails in issue.

On the other hand, since and before the decision in the first Moore-McCormack case, it has been defendant's position that where the local law of a country signatory to the conventions imposes upon a steamship company the obligation of carrying its mails without further compensation, in exchange for the granting of packet privileges for the company's vessels, the United States is relieved of its obligation to pay for the carriage of such mails. For the years involved in this action, defendant contends that under the local laws of Argentina, Brazil and Uruguay, plaintiff was required to carry their mails gratuitously in exchange for packet privileges or other preferred treatment for its vessels.

In the earlier suit plaintiff abandoned its entire claim for the carriage of Argentine mails and that part of its claim for the carriage of Uruguayan mails during the period that country's local packet laws were in force. We were, consequently, not called upon to decide how the local laws of those two countries affected the obligation of the United States. For this reason the prior action is not *res adjudicata* as to plaintiff's claim for the carriage of Argentine mails and Uruguayan mails.

The only question before us in the former suit was whether or not a Brazilian decree of June 3, 1941, required plaintiff to carry Brazilian mails gratuitously in return for certain privileges. We held that the decree did require plaintiff to carry the mails of that country without compensation in exchange for preferred berthing rights and exemption from lighthouse dues and local taxes. Plaintiff nows says that as the result of the

adoption of a new constitution by Brazil in 1946, that country could no longer constitutionally require plaintiff to carry its mails gratuitously. If so, then the former decision is not *res adjudicata* as to plaintiff's claim for the carriage of Brazilian mails in this action.

Since there was no express contract between plaintiff and the United States, in order to recover, plaintiff must show that there was an agreement implied-in-fact on the part of the United States to pay for the carriage of the mails involved. Grace Line, Inc., v. United States, No. 218–58, decided November 1, 1961. No contract can be implied for payment by the United States if plaintiff has already been paid for the carriage of the mails by the countries which demanded plaintiff's services. Plaintiff cannot collect twice for the rendition of the same services.

The crucial inquiry then is: Did plaintiff receive packet privileges or other preferred treatment for its vessels in return for which it assumed the obligation of gratuitously carrying the mails of Argentina, Brazil and Uruguay?

Since the burden is on plaintiff to show there was an implied contract under which the United States agreed to pay it for the carriage of these mails, it must show that it has not been compensated for the carriage of them by the acceptance of packet privileges, the granting of which obligated plaintiff to carry them without further compensation. This requires plaintiff to show what the law of these three countries is with respect to packet privileges, or to show that it did not receive packet privileges or other remuneration from the countries demanding that it carry their mails. Foreign law must be proved as any other fact. Cuba R. R. Co. v. Crosby, 222 U.S. 473, 32 S.Ct. 132, 56 L.Ed. 274.

That this burden is on plaintiff is particularly true in this case, in view of our prior decision in Moore-McCormack Lines Inc., v. United States, supra, wherein it was stipulated the receipt of packet privileges precluded recovery under the laws of Argentina and Uruguay, and wherein we held this likewise precluded recovery under the laws of Brazil. Plaintiff was thus on notice that the United States would refuse to pay for the carriage of these mails, if this situation continued.

We shall consider first plaintiff's claim for the carriage of Argentine mail.

Plaintiff did nothing to carry its burden of proving that Argentina did not require it to carry the mail of that country gratuitously in exchange for packet privileges. On the contrary, there is in evidence, as defendant's exhibit 11, a pamphlet in Spanish entitled "Digesto Maritimo Y Fluvial" relating to packet privileges. According to the witness, Mr. Bosch, counsel for the Consulate General of Argentina in New York, by whom it was identified, it was issued by the Maritime National Prefecture, an agency of the executive department of the Argentine Government. The witness testified that this pamphlet was an official publication of the Argentine Government. In support of this statement he said the document carried on the cover and flyleaf the heading, "Republic of Argentina, Maritime National Prefecture," and it bore the seal of the Republic of Argentina. The document was also prefaced by decree No. 125.571 issued by the President of Argentina on February 16, 1938,[1] which fact further supports the statement of the witness.

Plaintiff does not show that this was not a valid and binding regulation of the Government of Argentina.

Article 421 of the "Digesto Maritimo Y Fluvial", as translated into English by Mr. Bosch, reads in part as follows:

"All foreign ships with postal packet privilege shall be subject to the following obligations: (A) to carry gratuitously the mail and postal matter delivered to them by the general post office and telegraph for their ports in their itinerary or

---

1. No translation of this decree is in evidence.

for the ports which they shall come to in transit."

Plaintiff's contention that there was no packet privilege law in Argentina is plainly untenable. This was recognized in the letter of Albert F. Crystal, plaintiff's vice president to the Assistant Postmaster General, dated January 27, 1956, requesting that plaintiff be designated a "third service", the meaning and effect of which is not pertinent here. In his letter Crystal stated, "In Argentina no payment for postal transportation can be expected because of a local postal packet privilege law." Plaintiff thus acknowledged the existence of such a law. In fact, during 1948, plaintiff actually applied for and was granted postal packet privileges for its steamships, "Argentina", "Brazil", and "Uruguay".

Not only has plaintiff failed to prove it did not receive packet privileges from Argentina in return for the gratuitous carriage of its mails, but the defendant's evidence is unchallenged, and, being unchallenged, it affirmatively establishes the fact that plaintiff was obligated to carry the mails of that country gratuitously, in exchange for the granting of packet privileges for its vessels.

We cannot agree with the Trial Commissioner that "there is not satisfactory evidence in the record that Argentina, under its laws, required ships flying the flags of countries signatory to the Postal Convention of the Americas and Spain to carry mail without compensation in exchange for the granting by Argentina of packet privileges."

We turn now to plaintiff's claim for the carriage of Uruguayan mails.

As in the case of Argentine mails, plaintiff has done nothing to show it did not receive packet privileges from Uruguay and that receipt of them did not obligate it to carry Uruguay's mails without further compensation.

However, there are in evidence two decrees issued by the President of the Republic of Uruguay, one issued on November 7, 1946, and the other issued on January 3, 1952. The witness Bosch testified that both are valid and existing laws in Uruguay, binding upon aliens doing business in Uruguay.

Although no translation of the 1946 decree from Spanish is in evidence, the translation of the 1952 decree into English is in evidence. In Article 1° of the latter decree the President of Uruguay decreed:

"That the Regulations for the Concession of Patents of Packet Privileges be approved as worded in administrative documents Series * * in substitution of the actual Regulations for Packet Privileges approved by Decree N° 8011 of 7th November, 1946."

Article 11 provides:

All national or Foreign vessels holding Packet Privileges of Category "A", or whose Petition for same is under consideration, or as the case may be, their Agents', are subject to the following obligations:

"a) To carry free of charge all Mails and Parcel Post packages delivered to them by the General Postal Authorities for the ports of their itinerary or ports of call in transit.— It is understood that this obligation applies exclusively to Mails and Parcel Post from or for ports of the Republic * * *."

It is unnecessary for us to consider the different categories of packet privileges under this decree, since Article 12 makes Article 11, clause a) applicable to vessels holding Category B packet privileges, and Article 13 requires vessels holding Category C packet privileges to carry the mails free of charge as in the case of vessels holding Category B packet privileges.

In the letter of January 27, 1956, from plaintiff's vice president to the Assistant Postmaster General, which we referred to in regard to the claim for the carriage of Argentine mails, it is stated: "Our representatives in Uruguay have advised that the local postal administration under

local laws will not pay us for any postal transportation." Plaintiff thus recognized that it would not be compensated for the carriage of the Uruguayan mails in issue, except by the grant of packet privileges. During the period involved in this suit, plaintiff applied for and was granted packet privileges for 17 of its vessels.

We think the evidence establishes the fact that plaintiff was obligated to transport the Uruguayan mails "free of charge" in return for the packet privileges it applied for and received. Hence, plaintiff is not entitled to recover for the carriage of the Uruguayan mails.

As to the Brazilian mails, plaintiff says that any law requiring it to carry these mails gratuitously was in violation of a new constitution adopted by Brazil in 1946. It also says that in the earlier Moore-McCormack case, supra, the court construed an executive decree issued in 1941, while in this case a 1951 executive decree is involved.

With reference to plaintiff's contention that the provision for gratuitous carriage of its mails is unconstitutional, in the first place, we would be loathe to say that any decree or legislative enactment of a foreign country contravened the constitution of that country. Certainly we would not say so where the law had not been declared to be unconstitutional by authorities in that country with power to do so.

But, apart from this, it seems plain that the Executive Decree, which obligates plaintiff to carry Brazilian mails without further compensation beyond the receipt of packet privileges, does not violate that provision of the Brazilian Constitution upon which plaintiff relies. It is a provision similar to the provision of the Constitution of the United States, which prohibits the taking of private property without compensation. The decree does provide for compensation for the service demanded, as we said in our opinion in the former case. We therefore said:

"The obligation cast upon carriers such as plaintiff by this decree was not without consideration. It was an obligation imposed in return for the grant of certain packet privileges. Among those privileges were exemption from lighthouse dues, charity taxes imposed on each sailor and officer, and the grant of preferred berthing rights. By the acceptance of those privileges plaintiff obligated itself to carry Brazilian mails gratuitously * * *. [119 Ct.Cl. 484.]"

The 1951 decree was essentially a rewrite of the 1941 decree; the 1951 decree did not change the law as contained in the 1941 decree. Consequently, insofar as the claim for the carriage of Brazilian mails is concerned, our prior holding as to the effect of Brazilian law is controlling in this action.

There is no evidence in the record of whether plaintiff actually applied for or received packet privileges or other preferred treatment for its vessels from the Brazilian Government during the period for which payment is sought for the carriage of the mails. But, as in the case of plaintiff's claims for the carriage of Argentine and Uruguayan mails, plaintiff has the burden of proving that there was an implied promise by the United States to compensate it for the carriage of the mails of Brazil. In order to establish this, it was necessary for plaintiff to prove that it has not received compensation for the carriage of such mails. Not having proved this, plaintiff has not shown that any payment for the carriage of the Brazilian mails is due from the United States. It follows that plaintiff cannot recover for the carriage of these mails.

COUNT II

This is a claim for the expenses incurred by plaintiff in transporting incoming South American mails from its piers to post offices in the United States.

Since we have found under Count I that plaintiff has already been compensated for the carriage of these mails, it is clear that plaintiff cannot recover for the trucking of the mails from its piers to the post offices.

The carriage of the mails for which plaintiff has been compensated begins with the delivery of the mails to plaintiff's vessels by the postal authorities of the country concerned and ends with the delivery of those mails to the United States postal authorities. It is inconceivable to us that the South American postal authorities, when they tendered their mails to plaintiff, could have contemplated that their mails would be brought to plaintiff's piers and left there. They had to be delivered to the Post Office. Cf. United Fruit Co. v. United States, Ct.Cl., 288 F.2d 489, cert. denied March 19, 1962, 82 S.Ct. 830.

### COUNT III

▓ In Count III plaintiff seeks to recover compensation it says it would have otherwise been entitled to had it been granted the preference required by section 405(a) of the Merchant Marine Act of 1936, supra, which provides that "insofar as practicable" all mails of the United States shall be carried on vessels of United States registry.

In Grace Line, Inc. v. United States, supra, we held that section 405(a) does not grant a right to any particular organization operating vessels of United States registry to force the United States to grant it a 100 percent preference in the carriage of United States mails, but that the section appears to be more in the nature of a congressional declaration of policy to guide the Post Office Department in the discharge of its duties. That decision is controlling here and we hold that plaintiff has shown no basis for recovery under Count III.

Plaintiff's petition will, therefore, be dismissed.

It is so ordered.

REED, Justice (Ret.), sitting by designation, JONES, Chief Judge, and DURFEE, and LARAMORE, Judges, concur.

---

* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of